GOVERNMENT OF THE VIRGIN ISLANDS, Appellee

v.

EDWIN CALLWOOD, Appellant

No. 73-2012

United States Court of Appeals

Third Circuit

Argued April 25, 1974

Filed June 7, 1974

RONALD T. MITCHELL, ESQ. (PALLME, ANDUZE & MITCHELL), St. Thomas, V.I., *for appellant*

ISHMAEL MEYERS, ESQ., Assistant United States Attorney, St. Thomas, V.I., *for appellee*

Before ALDISERT, ADAMS and GARTH, *Circuit Judges*

OPINION OF THE COURT

ALDISERT, *Circuit Judge*

This appeal from a final judgment of sentence presents questions as to the correctness of jury instructions on transferred intent and self-defense. After a three day trial a jury of twelve returned a verdict of first degree

murder. Pursuant to 14 V.I.C. § 923(a) defendant was sentenced to life imprisonment.

Defendant, a Virgin Islands Deputy Marshal, shot and killed his ex-wife with whom he was living. While the fact of his shooting the decedent was undisputed, testimony of the prosecution and the defendant concerning the circumstances surrounding that shooting was in direct conflict. The prosecution's chief witness, Holland, testified that he was driving the victim home in her car when she recognized the defendant approaching in another vehicle from the opposite direction. Although they attempted to evade the defendant, Holland testified that defendant pulled along side of their car and fired a shot missing both of them. The chase continued until Holland reached the end of a dead end street. Holland then testified that he ran from the car, hurled rocks at the defendant, and ran into nearby bushes. He then testified that he saw the defendant proceed to the victim's car, point the gun in the car and shoot. The next thing he heard was the victim exclaiming: "Oh, God, Edwin, you shot me"![1]

---

[1] A total of 18 questions are presented in this appeal, 11 dealing with asserted errors in the court's instructions. Other than the instructions as to transferred intent and self-defense, no timely objection pursuant to Rule 30, F. R. Cr. P. was made. Assuming arguendo that there was some error, none of the unobjected to passages constitute plain error.

While appellant admits that our primary concern should be directed to the "deficiencies and prejudgmental tone of the instructions," he raises various additional points of asserted error. We have carefully considered each of these contentions and find them to be without merit.

10. Was it error for the Court unnecessarily and unfairly to disparage or impugn the significance and impact of certain aspects of cross-examination of police officers who testified to damaging alleged admissions of the Defendant and overly to suggest to the jury that the Court considered any discrepancies or failure to recollect examples of immaterial or innocent misrecollection or failure to recollect?

11. Was it error for the prosecutor to argue to the jury that he represented the "law abiding citizens" of the community and to urge the jury to do its duty just as other persons in the law enforcement chain or process had done, naming the police and the prosecutor as examples?

12. Was it error for the Court, sua sponte, to inquire of and permit testimony by the chief investigating police detective who sat with the prosecutor throughout the trial, concerning the alleged murder weapon and its contents after the alleged crime, when the Government did not and could not produce the weapon and its contents and offered no explanation to the jury and Court of its failure to produce this weapon and its

Defendant testified in his own behalf, denying firing into the victim's car during the chase. Defendant's summary of his testimony with respect to the events that took place at the dead end street discloses:

At the scene the Defendant claims he pulled off the road on a slant parallel to and some thirty-odd feet away from the decedent's car. As he pulled up, Holland quickly exited from the car he was driving. As the Defendant emerged from his vehicle, Holland hurled rocks or stones at the Defendant, hitting him several times. The Defendant moved away from his car to draw fire away from the car. The Defendant demanded the identity of Holland and how he had come to have the decedent's car. He further demanded that

---

contents, although the weapon would have yielded the best evidence of how many times it had been fired on the evening of the alleged crime?

13. Was it error for the Court to permit over objection the father of the decedent to characterize the activities of the Defendant on the evening prior to the alleged crime as "circling" and to deprive the Defendant of valid lines of cross-examination of the father by unnecessarily obstructing and interfering with the confrontation of the father with prior testimony at a preliminary examination for probable cause for trial which contradicted and diminished the impact of his trial testimony?

14. Did the prosecutor unfairly represent to the jury and/or make unfair use of the deposition testimony of the pathologist, Dr. Bernard Rumsch, concerning the position of the assailant and the possible distances of the assailant from the decedent and/or the automobile in which she apparently was shot and make unfair comment upon the exercise of the right to counsel?

15. Was it an abuse of discretion not to grant a change of venue or to conduct an adequate hearing on the question of community bias, hostility and prejudgment of the guilt of the Defendant, when the Court was apprised through an offer of proof by defense counsel that the alleged crime had been the subject of a front-page, highly prejudicial article in a widely-read, influential newspaper (the now defunct "The Home Journal"); that defense counsel in the last four to five days prior to trial encountered several persons who knew or had learned of the impending trial and who expressed hostility and prejudgment against the Defendant based either on newspaper account, on what they had heard since the alleged crime or on the public discussion of the impending case on a popular evening radio program ("Night Line") broadcast each evening and inviting members of the public to express, by broadcast telephone conversations with the broadcaster, candid opinions on matters of current or personal interest or concern; and that a few days prior to trial the telephone call of at least one person not related to the decedent or her family was broadcast over the Night Line program, in which the caller demanded to know why the ex-Marshal who had murdered his wife, was still walking the streets?

16. Is reversal or remand for new trial or juror examination required by reason of a lack of candor or failure to disclose on the part of certain jurors important hostile encounters with associated defense counsel and close acquaintance with a fellow hospital worker who was the sister of the decedent?

Appellant's brief at 16–18.

Holland come forward and have a man-to-man talk. The Defendant moved toward the decedent's car. Heated, profane words were exchanged. Holland threatened to take the Defendant's life that night in a once-and-for-all confrontation. As the Defendant approached, Holland circled the decedent's car towards the passenger's side, cursing and threatening the Defendant in the darkness. The Defendant fired a shot in the air as his vision of Holland was obscured. Thereafter, Holland reached quickly into the car toward the dash or glove compartment. The Defendant fired quickly towards the moving hand or arm.

A voice suddenly cried out, "Oh God, Edwin, you shot me," and for the first time, according to the Defendant, the Defendant knew someone other than Holland was on the scene.

Appellant's brief at 7. Defendant then fled from the scene and was subsequently arrested.

Defendant argues that the court's instructions on transferred intent were somehow unduly favorable to the Government and were detrimental to him. Initially the court charged:

It may be that a person shoots at Peter but instead kills Paul. If the circumstances under which A shoots at B would be such that had B been killed it would have been a crime, then it would be equally a crime if A, unlawfully intending to kill B, killed C and to the same extent that it would be a crime had B been actually killed to the same extent it would be a crime if C is killed. So that if you should find after your examination of all the facts of this case that the defendant fired the shot intending to hit Holland, and if you should also find that he shot and killed Holland, in those circumstances he would have been guilty of murder or manslaughter, then he would likewise be guilty of the same offense, having killed Nyra, for his unlawful intent to do harm to Holland would be transferred to Nyra and he could not escape culpability merely because the wrong person got killed, if the circumstances were such that his killing of the person he intended to kill would have been unlawful. Here again this is if you so find. And in instructing you I do not suggest what you should find one way or another, for, as I have repeatedly stated, you are the trier of the facts. You are the judges of the facts. These

211

instructions have been given to you merely to guide you as to the applicable rules of law.

N.T. 599–600.

At the conclusion of the charge the defendant specifically objected:

I think that the connection between accidental killing and transferred intent is not adequately explored. That is, the example given was of the case where an individual had an intent to kill one but wound up killing another. I think the opposite situation might well be illustrated, namely, that if this was not intended or unlawful intent to kill and yet some other person is killed that the defendant is to be judged in terms of unlawful intent of his original intention. I simply think that the example chosen is overly suggestive. That is to say, it ignores the testimony that the defendant did not intend to kill A but rather to wound A but he wound up killing B. In that situation that version of the facts have not been given—an example which would clarify the full scope of the relationship between transferred intent and accidental killing.

N.T. 606–607.

The Court responded by supplementing its charge in the precise manner defendant requested.

I also instructed you that if a person intending to kill A killed B instead to the extent that he would have been guilty if he had killed A, he is guilty if he killed B. It goes without saying if the circumstances under which a person accidentally killed B exists and would have been the same if he had killed A, the accident is there in any event.

N.T. 608. Thus, any possibility of suggestiveness in the initial charge was cured by the court's supplemental charge.

Defendant next argues that the court's self-defense charge was cast in terms of justifying the homicide, was not clarified in terms of the factual posture of this case, and was misleading in the sense that it did not specifically refer to Holland's conduct as that which should be con-

sidered. Additionally, appellant contends that the court should have charged on the effect of a good faith but mistaken exercise of the right of self-defense. We have carefully reviewed the court's initial and supplemental charges and conclude that, as given, the charge accurately summarized the applicable law as codified in 14 V.I.C. § 927 (2) (C).[2]

We have considered all the contentions of the defendant and find them to be without merit. The judgment of the district court will be affirmed.

---

[2] § 927. *Justifiable homicide defined*
　　Homicide is justifiable when committed by—
　　　　　　*　　　　　*　　　　　*
　　(2) any person—
　　　　　　*　　　　　*　　　　　*
　　　　when committed in the lawful defense of such person, or of a wife or husband, parent, child, master, mistress, or servant of such person, when there is reasonable ground to apprehend a design to commit a felony, or to do some great bodily injury, and imminent danger of such design being accomplished; but such person, or the person on whose behalf the defense was made, if he was the assailant. or engaged in mortal combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed. . . .